```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF KENTUCKY
                         CENTRAL DIVISION
                       LEXINGTON, KENTUCKY

UNITED STATES OF AMERICA,       ) Lexington Criminal
                                ) Action No. 18-112
     Plaintiff,                 )
                                ) At Lexington, Kentucky
-vs-                            )
                                ) February 25, 2019
EUGENE BARBER & SONS, INC.,     ) 10:30 a.m.
                                )
     Defendant.                 )



           TRANSCRIPT OF SENTENCING HEARING PROCEEDINGS
              BEFORE THE HONORABLE JOSEPH M. HOOD
               UNITED STATES DISTRICT SENIOR JUDGE



Appearances of Counsel:

On behalf of Plaintiff:      KATE K. SMITH, ESQ.
                             Assistant U.S. Attorney
                             260 West Vine Street
                             Suite 300
                             Lexington, Kentucky  40507

On behalf of Defendant:      ANDREW L. SPARKS, ESQ.
                             KERRY HARVEY, ESQ.
                             Dickinson Wright PLLC
                             300 West Vine Street
                             Suite 1700
                             Lexington, Kentucky  40507

Court Reporter:              PEGGY W. WEBER, RPR
                             Official Court Reporter
                             U.S. District Court
                             P.O. Box 362
                             Lexington, Kentucky  40588
                             (859) 421-0814



Proceedings recorded by mechanical stenography,
transcript produced by computer.
```

1   (Whereupon, the Sentencing Hearing proceedings
2 commenced on Monday, February 25, 2019, at 10:30 a.m., on
3 the record in open court, as follows.)
4           THE COURT:  Madam Clerk, call the matter on,
5 please.
6           THE CLERK:  Yes, Your Honor.
7           Lexington Criminal Action Number 18-112,
8 United States of America versus Eugene Barber & Sons,
9 Inc., called for sentencing.
10          THE COURT:  Let the record reflect that the
11 United States is present in the courtroom by counsel, that
12 the defendant is present in the courtroom with counsel.
13          Ready to proceed, Ms. Smith?
14          MS. SMITH:  Yes, Your Honor.
15          THE COURT:  Mr. Sparks.
16          MR. SPARKS:  Yes, sir.
17          THE COURT:  If you and the corporate
18 representative would come to the podium.
19          I assume that the parties have seen the
20 presentence report and that there are no unresolved
21 objections?
22          MR. SPARKS:  That is correct, Your Honor.
23          THE COURT:  I think the base offense level is a
24 16.  Obviously, there is no criminal history involved.
25          Under the guidelines probation is possible for

1  one to five years.
2         There is a fine range of 105,000 to 210,000.
3         And there's a special assessment of $400.
4         That accurately calculated, Ms. Smith?
5         MS. SMITH:  Yes, Your Honor.
6         THE COURT:  Mr. Sparks.
7         MR. SPARKS:  Yes, sir.
8         THE COURT:  All right.  Would you like to speak
9  on behalf of the defendant?
10        MR. SPARKS:  Yes, sir.  Your Honor, my clients
11 in this case have admitted their mistake from the
12 inception when the agents showed up.  They discussed it
13 and admitted doing the underlying conduct.
14        When I met them for the very first time, what
15 they said was they accept responsibility for this and
16 wanted to move on as quickly as possible.  And that's what
17 we've tried to do is move this as quickly as possible
18 without any delays through the system.
19        This has taken an enormous personal toll on the
20 owners.  Not a day has gone by this has not weighed
21 heavily on their minds.
22        This is a company that's been in business since
23 the 1940s.  They've always done business the right way,
24 that has been built on integrity and honesty and hard
25 work.  And they made a mistake, and we've admitted that.

1          The only issue here is what is the appropriate
2 punishment, and I'm going to briefly talk about that.
3          There's a couple of factors under 18 3553(a)
4 that I think are not at all to be considered.  One is
5 whether they're a danger to the community.  They're not.
6 They're not a danger at all to the community.
7          And the second is whether there's any need for
8 training, education, or any sort of treatment.  So there's
9 no need for that at all.
10         So I'd like to focus on the history of the
11 defendant, the nature of the offense.
12         In this case what we did is we took ICVIs, these
13 documents, and they prefilled them.  And I have some if
14 Your Honor wants to look at them.  But essentially these
15 are travel papers, and what they're designed to do is to
16 help track the transfer of cattle throughout the country.
17 That's what they're designed to do.
18         What the veterinarian's role is in this is to
19 certify that they do not see any sort of problem with the
20 cattle.  It's really akin is if a doctor walked into this
21 room, looked around, and said nobody in here has an
22 infection.  The veterinarians do not individually inspect
23 the cattle.  They do not do any sort of blood testing or
24 other testing on it.  That is what they do, and the
25 documents referenced the type of cattle, the average

1 weight, and their destination.  That's the purpose of an
2 ICVI.
3             All of these cattle here were going to a feeder
4 lot.  None of them were going to a slaughterhouse.  And
5 why that's important is that at no point could any of this
6 have ever gotten to the food chain at all.
7             I think the other point is that it is not in
8 anybody's interest, not my client's or anybody's,
9 interest, to allow sick cattle to be transported.  They
10 just lose money if they do that.  So that is the nature of
11 the offense.
12            The history of this defendant is that, like I
13 said in the sentencing memorandum, they have been around
14 since the 1940s.  They've been a fundamental part of the
15 cattle industry in Kentucky.  They're good people who made
16 a mistake.
17            One factor is whether is the need to avoid
18 unwarranted discrepancies at sentences.  Judge, we looked,
19 and we can't find another prosecution anywhere in the
20 country for ICVIs like this.  So I don't think that's a
21 consideration for the Court.
22            And the last factor I'd like to bring up is that
23 there was no profit that was made from this.  All of this
24 cost gets passed along to the feeder -- to the feeder
25 lots, to the owners of the feeder lots.

1          I know in the sentencing memorandum and the
2   presence report Dr. Moran estimated that he saved us
3   approximately $70.  I'm not quite sure where that number
4   comes from.  What I will tell you is that we pay $20 now.
5   There's no service charge.  There's no trip charge.  We're
6   paying $20 now.  We were at all times paying market rate,
7   and market rate went up when this case was brought, and
8   that's when we started paying more.
9          So at no point on this has my client made any
10  money from this actions.  So there is -- there are no
11  victims here.  There's no profits to disgorge.  There's no
12  restitution to be made.
13         Simply put, this is just an issue of how do you
14  punish this company?  We suggest in here $50,000 is an
15  appropriate punishment.  That is what is sufficient but
16  not greater than necessary to deter this conduct and to
17  punish the company for what it did.
18         THE COURT:  All right.  Thank you.
19         Ms. Smith.
20         MS. SMITH:  Thank you, Your Honor.
21         I had filed a sentencing memo on behalf of the
22  United States on Friday outlining the slightly different
23  perspective the United States has on this conduct and why
24  the high end, the top of the guidelines, is sufficient but
25  not greater than necessary.

1         And those factors really are that, as Mr. Sparks
2    said, this is punishment and to punish a company for a
3    crime that went on for more than a decade, and that every
4    level of the corporation was aware of and condoned.  But
5    that is -- that is a reason to go to the top of the
6    guidelines.
7         The range here is not so much of a hardship, and
8    the company does have the ability to pay that fine.
9         And Mr. Sparks is correct that this is an
10   unusual prosecution, but it is one that is being watched,
11   and the policy consideration of deterrence to others is a
12   very important consideration, and a substantial fine is
13   the best way to deter others.
14        Frankly, if they're just fined $50,000 for
15   something that went on as long as it did, that's a
16   consideration that a company might choose to -- that it's
17   a bargain that they might take to just pay $50,000 for a
18   long time subversion of federal law.
19        And I understand their view of the value of
20   these certificates, but federal law is federal law.  And
21   the law is there to protect the United States, and
22   Congress was well within their power in passing such a
23   law.
24        So for all --
25        THE COURT:  How do these --

1           MS. SMITH:  -- those reasons --
2           THE COURT:  -- certificates protect the public?
3           MS. SMITH:  Two ways.  One is you have a
4  veterinarian inspecting cows before they get shipped in
5  our state.  And all the other veterinarians we interviewed
6  as part of this case actually do that.  And it's not as
7  detailed of an inspection as you might have in other
8  breeds of cattle, but they're still able to observe if the
9  cattle are sick because they're seeing them.
10          Two, there is a tracking mechanism built into
11 these ICVIs.  The certificates say where the cattle
12 originate and where they go.  So that if at some point a
13 sick cow is identified, which would happen when they get
14 to Iowa, you can tell where they started it from.
15          Here, the certificates Barber & Sons was using
16 all had a location, an origination point, of Lexington,
17 Kentucky.  That was not true.  That was not true since
18 1998 when they started this scheme with Dr. Moran.  That
19 was evident with the certificate that was identified in
20 the shipment coming from Tennessee.  That certificate was
21 useless because it didn't tell the inspectors where the
22 cattle actually started.  If there had been a problem with
23 any of these shipments, regulators would not have been
24 able to tell where the problem started, what other cattle
25 might be implicated, because the piece of paper was

1 useless.
2 　　　　Does that answer your question?
3 　　　　THE COURT:  Yeah.  I mean, I was -- obviously, 4 you can sit there and watch a herd of cattle go by and say 5 they all look fine to me, but if they're saying a herd of 6 cattle go by and they all look like they're fine to me but 7 they started in Tennessee, not in Lexington, then that vet 8 did not inspect them.
9 　　　　MS. SMITH:  Right, Your Honor, and that's why 10 this --
11 　　　　THE COURT:  He could not have said whether they 12 were sick.  And say a cow has some -- well, I don't know, 13 some disease that could be seen by visual inspection, they 14 could tell where that cow came from and where there might 15 be a problem.
16 　　　　MS. SMITH:  That's right, Your Honor.  And 17 that's why the USDA has this process in place, and that's 18 why a USDA accredited vet has to sign these certificates.
19 　　　　THE COURT:  And it anticipates them inspecting 20 them.
21 　　　　MS. SMITH:  Correct.
22 　　　　THE COURT:  And not just giving somebody a whole 23 bunch of blank certificates.
24 　　　　MS. SMITH:  Correct, Your Honor.
25 　　　　THE COURT:  Okay.  Thank you.

```
 1                Mr. Sparks.
 2                MR. SPARKS:  Judge, if I could just briefly
 3   address both of those issues.  As far as the inspection,
 4   I've had the opportunity to go out to the stockyards and
 5   sit with the owners.
 6                THE COURT:  Is that the new stockyards?
 7                MR. SPARKS:  Yes, sir.  The ones out
 8   Ironworks Pike.
 9                THE COURT:  Okay.
10                MR. SPARKS:  And how that would work is you can
11   come out, and you're up off the floor, you're about
12   10 feet off the floor.  The closest ones may be as close
13   as you are to me.  The stockyard goes back about
14   100 yards, and it's just an enormous stockyard with the
15   cattle.  There is not any sort of individualized
16   inspection of each cattle that goes through.  You're
17   looking at a herd of cattle from anywhere from 10 to
18   100 yards away.  And from that -- and I do think that my
19   analogy of a doctor coming in here, looking around the
20   room and saying there's no obvious signs of infection in
21   here is appropriate.  I mean, that's -- that's what --
22                THE COURT:  Well, let me ask you this.  Say your
23   doctor comes from Flemingsburg and without looking at
24   everybody in this room says they're all well.  Now,
25   there's a problem there, isn't there?
```

1           MR. SPARKS:  Yes, there is.  And that's why we
2  pled guilty.  We've acknowledged that is -- that that
3  shouldn't have happened.
4           I will say this was widespread in the industry.
5  That doesn't excuse it, but it was the practice.
6           And, again, I think it goes to what it is you
7  will actually be looking for.  And that's why I earlier I
8  mentioned it's in nobody's best interest to send sick
9  cattle.  If these cattle were sick, and Barber & Sons or
10 anybody else sends them, they're not going to get paid for
11 them, and they risk losing, I guess, infecting more
12 cattle.  So there's absolutely no financial incentive
13 whatsoever.  These are experienced cattlemen.  That's why
14 the industry has sort of come up this way and used these
15 as travel papers.
16          So Ms. Smith makes a good point, but the
17 inspection process was not what I thought it was going to
18 be when I first heard of this.  I thought it was going to
19 be an actual physical inspection of the individual cattle,
20 and that's not it.  It is simply at best a quick look over
21 a lot of cattle.
22          So I -- I think that is a very limited utility.
23 I think the importance is the ability to track the papers.
24          The issue with the cattle from Tennessee should
25 not have happened, but that's -- that was not what -- how

1 they ran the -- ran their business.
2         I would suggest that at all times had anything
3 ever come up with these cattle, and over 18 years, there's
4 not any indication that that happened, nor is there any
5 indication anywhere that I'm aware of veterinarians
6 actually doing this inspection and starting to pull
7 cattle.
8         But regardless of that, this would have come
9 from -- this would have still allowed people to trace
10 exactly where the cattle came from.
11         And really the importance behind this is and,
12 you know, last thing I say, this is for convenience. Why
13 it was done was for convenience. Right now what happens
14 is the cattle are sitting out there, maybe have to sit out
15 there for three, six hours, whenever, until a vet comes
16 in, does this very quick review of the cattle. That
17 actually is not good for the cattle. That is not in
18 their -- Mr. Paul described it as a ripe tomato. The
19 longer they sit, the worse they get.
20         So that is why this was done. It was done only
21 as convenience, only to move the cattle quicker to the
22 feeder lots. At no point was there ever any intention to
23 deceive anybody. There's never any intention to make any
24 profit off of it. And there certainly was never any
25 intention to move sick cattle in interstate commerce.

```
 1                THE COURT:  Okay.  Thank you.
 2                Congress has said that they're supposed to do
 3   this, and it would appear that everybody agrees that
 4   Barber & Sons, Inc., decided, ha, Congress said that, but
 5   it's our decision that we think we're smarter than
 6   Congress.  We don't think it's necessary, so we're not
 7   going to do it.  We're going to get with -- have the vet
 8   fill out papers, and we're going to just do it the way we
 9   want to do it, and this is the way everybody has been
10   doing it, and we think we're smarter than everybody.
11                Well, I don't know if you're smarter than
12   Congress.  I would hope that you are, but I think that
13   there's got to be a fine here, because I'm sure this all
14   has been -- there's probably cattlemen network
15   publications and things that this would go into, as well
16   as agriculture industry publications.  And I'm sure this
17   will get out.
18                There's no financial gain particularly other
19   than the fact that you didn't have to pay as much for the
20   inspection, but it was more than $150,000.
21                So it is the judgment of the Court that based on
22   the presentence report, which I accept, and find that the
23   advisory guidelines have been correctly calculated, and
24   the facts contained therein are true and accurate.
25                The sentence in this case is imposed to promote
```

1  respect for the law, not change -- not as I see it law,
2  but the law, provide just punishment, and act as a
3  deterrent to future criminal activity.
4           It is the judgment of this Court that pursuant
5  to the Sentencing Reform Act of 1984, the Court finds that
6  the following sentence is sufficient but not greater than
7  necessary to comply with the purposes of 18 USC,
8  Section 3553(a).
9           Accordingly, it is the judgment of the Court
10 that the defendant, Eugene Barber & Sons, is hereby placed
11 on probation for a term of three years, unsupervised
12 probation.
13          It is further ordered the defendant shall -- the
14 corporation shall pay a fine of $150,000.  This fine shall
15 be paid in installments, with the first installment due
16 30 days after sentencing.
17          It's further ordered that the defendant shall
18 pay a special assessment of $400, which is due
19 immediately.
20          Any questions or objections regarding that
21 sentence, Mr. -- Ms. Smith?
22          MS. SMITH:  No, Your Honor.  And the
23 United States moves to dismiss Counts 2 and 3 as to the
24 corporation.
25          THE COURT:  Counts 2 and 3 are dismissed.

```
 1              Any questions or objections regarding that
 2   sentence, Mr. Sparks?
 3              MR. SPARKS:  No questions, Your Honor.  We'll
 4   enter an objection to the amount for the reasons stated.
 5              Thank you.
 6              THE COURT:  All right.  Corporation has the
 7   right to appeal the sentence that I impose.  Notice of
 8   appeal has to be filed within 14 days of the date of
 9   judgment -- written judgment in your case.
10              Is that understood?
11              MR. SPARKS:  Yes, sir.
12              THE COURT:  Have him sign the acknowledgment,
13   and Mr. Barber too.
14         (Whereupon, the acknowledgment was signed.)
15              PROBATION OFFICER:  Your Honor, would you like
16   the judgment to reflect the exact amount of monthly
17   installments, how much they would need to pay per month?
18              THE COURT:  Yes.
19              PROBATION OFFICER:  Do you have an amount in
20   mind?
21              THE COURT:  Well, they're going to be placed on
22   probation for four years, divide 48 into 150,000.
23              PROBATION OFFICER:  Yes, Your Honor.
24              MR. SPARKS:  Your Honor, I believe you said
25   three years probation.
```

```
 1                THE COURT:  I may have.  Yeah, you're right,
 2   excuse me.  Divide 36 into that.
 3                Anything else, Ms. Smith?
 4                MS. SMITH:  No, Your Honor.
 5                THE COURT:  Mr. Sparks?
 6                MR. SPARKS:  No, sir.
 7                THE COURT:  I see there's another Dickinson
 8   Wright lawyer here.
 9                MR. SPARKS:  Yes, sir.
10                THE COURT:  This is the second time I think
11   you've been to this court, haven't you?
12                MR. SPARKS:  Might be the first.
13                MR. HARVEY:  I've been here a time or two,
14   Your Honor.  Just learning from Mr. Sparks.
15                THE COURT:  Let's see, you were here when you
16   got sworn in.
17                MR. HARVEY:  I was here -- the first time I was
18   here I was representing the Commonwealth of Kentucky in
19   the Michelle P.
20                THE COURT:  I forgot that.  Yeah.
21                MR. HARVEY:  Did not go well for me that day as
22   I recall.
23                THE COURT:  Well, it did go well for Michelle P.
24                MR. HARVEY:  It did, yes, sir.
25                THE COURT:  Okay.
```

1        MR. HARVEY: And that program, by the way, is
2 still providing a lot of benefits I understand.
3        THE COURT: Well, it should, yeah. Thank you.
4        Being nothing further at this time, you-all are
5 excused.
6        Court will remain in session.
7        Oh, court will be in recess until 11:00.
8    (Whereupon, the Sentencing Hearing proceedings
9 concluded at 10:50 a.m.)
10                C E R T I F I C A T E
11    I, Peggy W. Weber, certify that the foregoing is a
12 correct transcript from the record of proceedings in the
13 above-entitled matter.
14
15
   April 10, 2019                    s/Peggy W. Weber
16      DATE                         PEGGY W. WEBER, RPR
17
18
19
20
21
22
23
24
25